Sharon Kramer v. AWomans Place Good afternoon, Your Honors. My name is Wayne Ely. I represent Sharon Kramer, the appellant. I have a couple of questions as to what went on. This is a day-and-a-half trial with a 20-minute jury deliberation or a little bit more than that. Am I right about that? That's correct, Your Honor. On page 222-223 of the appendix, which is really the whole trial and that was helpful for the court, your adversary is cross-examining the witness that you call Ms. Byrne, and we're now coming against that disputed piece of evidence. D-9. D-9, yeah. And he says, when you read that letter, a letter came from a resident that obviously affected her decision-making and contrary to the given reason and contrary to Ms. James' testimony. And then the question was, although it's a ten-page letter, we can mark it as an exhibit. I could ask you to read it. Why don't, can you summarize, just tell me what the gist of that letter is? What you got out of it that affected your decision? And then Mr. Ely said, objection, period, well, comma, there, T-H-Y apostrophe R-E, dash. What was the basis of your objection then? What is well there before the judge cut you off and said, sustain, you will have to read it or read portions of it? My recollection, Your Honor, and I apologize, it's been over two years, was that I was going to reassert a hearsay objection. Okay. But I'll be very frank, I could very well be wrong and I'm not sure 100% what my recollection is. That's my best recollection as I stand here today. And your position throughout was that this was hearsay and the court was persuaded by your adversary's position that the evidence came in to demonstrate that there were reasons beyond an age discrimination animus that prompted the firing of Ms. James. Correct. And under 801C, if Your Honors find that that is correct, these letters would not be hearsay. Our argument obviously is to the contrary. If I may briefly, Judge Hayden and I began discussing this. I did not reserve time for rebuttal. I previously requested three minutes for rebuttal. That's fine. Thank you, Your Honors. In reviewing this for argument, I've had trouble trying to articulate what it is I think Your Honors need to do because I try discrimination cases for a living. And in this case in particular, it seems manifestly unfair that you have anonymous letters. Letters, the authors of whom we still have never been given, people we did not have a chance to depose, that are read to the jury. And I can summarize what those letters say. Your Honors saw it. This woman worked with Hondas Shelter for 14 years. She did this because she loved it. She didn't do it to make money. Let me ask you a question about the letters. When exactly were they written? Is that in the record? Were they written? It is. Mr. Santarone refers to in his closing. I believe it's at 361A. I stand corrected. Yes, in 361A at line 13. And I'm going to be getting into his closing a little more in a few minutes. She was involved in incidents in May and June. I believe the letters were written in May and June. Okay, so they were not written later in preparation for trial. They were written contemporaneous with the incidents. I can't tell you if that's the case or not. Well, your position in your closing was that they hooked up these letters or at least pressed folks to write them so that they could mask their discriminatory intent. That's correct. I was given sort of a Hobson's choice in closing and as well as in opening because we were basically told by Judge Davis before we opened the letters were coming in. At that point I knew I had to deal with them and I think they've also made an argument that I mentioned it in opening and therefore I kind of opened the door for it. I can cite cases to your Honors if you like that opening is not evidence as your Honors well know. But if your colleague wanted the basic thrust described, you objected to that. I did mainly because I was never given the names. There's a reference in the closing as well to the fact that these letters were confidential. I don't know what the basis is for that other than the fact that they simply chose not to put them in their disclosures. I mean didn't your client know who they actually were? She did not. She did not and in fact there's some testimony from her in the record. I believe it's at 147A beginning at 21. I thought well when I get the letter it will all be revealed. Then I get the letter. This is the letter that we're talking about. It's discussed actually right at the top where they say they no longer need her services. There's also an argument they made that that was the main thrust of the reason they got rid of her. I'll get back to that in one second. When I get the letter it will all be revealed. Then I get the letter and I'm thinking quote what in heaven's name happened? And it says we will no longer need your services. And I thought this is the letter that's going to make everything clear about not needing my services and there was nothing here. So our contention at trial was and it remains today she had no idea what was happening here. It is a little odd that there was 14 years without a problem. Isn't the record replete with testimony that there was a problem about her falling asleep or going to sleep at night? There was a reference to sleeping but it's nowhere near as damaging as the type of evidence that was read in regarding her breaking the residence piggy bank, regarding her attempting to have the person thrown out on the street. That was extremely, extremely damaging evidence. I don't believe she had a chance at a fair trial once that came in. And you're saying it was error to have let the letters in? I believe so. To allow them to be read to the jury. Well but you objected to their being summarized. I mean they had to get this in one way or another to show the reason. Right. Somebody told us X and therefore this is why we acted. Now they didn't start out saying oh and we want to tell you they told us X, Y, Z. But that ended up, after your objection, they ended up reading the entire record. So I mean things happen in court and maybe the judge shouldn't have done that and the judge gave an instruction. There was clearly a limiting instruction and I don't believe that under the circumstances of this case that could have cured the problem that was caused by that hearsay coming in. What should have happened here? What should have happened was witnesses should have been called in to testify to what happened. We should have been given the names to determine whether or not. Did you seek discovery? Did you seek a continuance to find these people and try to determine their credibility? We did not. We did mention that we had not been given their names in Rule 26 disclosures. Isn't that what you do when you're caught by surprise and this horrible damaging evidence is going to come in and you say unfairness? Did you get these letters in discovery? We did get the letters but we did not get the identities of the writers. Did you seek the identity of the writers through discovery? I don't recall standing here today if we did or not. Either way they have an affirmative. Maybe it was, I don't know if it was preventable or not. You're right, it's damaging. I just don't know whether it could have been salvaged. Well I would point out again they had an obligation affirmatively if they knew these individuals had possibly discoverable information to give us those names under Rule 26. How much harm was done given the testimony of several witnesses and the consistency of their testimony related to Ms. Kramer sleeping through the night, which made perfect sense because she had a day job and she even kind of indicated that there were times when she was going to snooze. That's a different reason than age, right? That's correct but I believe there was also testimony from Ms. Kramer that the people in that position were permitted to sleep under certain conditions and that she had not done anything wrong in fact. It's indisputable that if this woman committed the acts that they're saying she did with these hearsay letters, I mean who would allow someone like that to work at a shelter for abused women? That's apparently what the jury heard. The problem here was that this evidence was not admitted for its truth and in preparing to come here today I found a Third Circuit case that may be of some help. United States vs. Salins. Yes I could. S-A-L-L-I-N-S-993-F-2-344. It's a 1993 opinion. This was a criminal matter in which the government attempted to bring in hearsay evidence in the form of radio tapes and a phone call. The court held that when a disputed statement is hearsay, it frequently turns on the purpose for which it is offered. If the hearsay rule is to have any force, courts cannot accept without scrutiny an offering party's representation that an out-of-court statement is being introduced for a material non-hearsay purpose. Rather, courts have a responsibility to assess independently whether the statement, whether the ostensible non-hearsay purpose is valid. In this particular case they found that it was not valid. Based on the overall facts of the case, I suggest that this should be applied in the context of employment discrimination cases, whereas here we see the letter we have at the record 145A. We don't need your services anymore. We have testimony from two shelter coordinators, both of whom say we didn't need your services anymore. They hedged a little bit at the end because they realized where it was going. So you're saying is this genuine that this really was the real reason that they wanted these letters to come in? Now was this argument made to the court? This argument was not made to the court, but I would point out that, Your Honors, in interpreting the application of a rule of evidence, you have plenary review. I don't believe we waived anything. Well, except it would be plain error. That's correct, but I believe it was plain error. Because the other point that the Salem's court looked at was the closing of the government and the way the government dealt with the disputed evidence. Did the government assume that the evidence that had come in was actually fact? And if you look at the closing in this case, you see the same thing. At page 354A, beginning on line 19, the residents, quote, the residents, comma, their identity is protected, comma, that's the law. I don't know where that's coming from. They went through that as to why the first dash, the initial of the dash of the resident is here and why the residents aren't here. The residents are the ones that are there overnight. They're the ones that would have witnessed it. Now this conduct is being taken as a given. Defense counsel is arguing that it happened. That contradicts the purpose for which he attempted to get it in and for which Judge Davis let it in. Moving over to 361A. She was involved in incidents in May and June. How can this gentleman argue? This was not admitted for its fact, for its truth, when he is treating it as such in his closing. And a review of the Salem's opinion and a couple of opinions after that, one of which was Lopez, I believe, and one of which was Price, points out that where the government, in the criminal context, treats the evidence as though it was admitted for its truth, the overall facts of the case indicate it was not admitted as such. It was admitted for its truth and not as an exception under 801C. And did you object to those references? I'm sorry, Your Honor? Did you object to those references? The references to? In the closing. I did not object in closing. I'm very careful about objecting during closing. Well, I mean, but sometimes after the closing, you go to the judge and say, I want to notify you of my objections to this in this portion of the closing. I see my time is up. May I answer your question, Your Honor? Sure. I did not do that, but given the fact that you're to look at the entire facts of the case as presented, I don't believe the fact that I did not weight anything. Did you try in, I'm sorry, can I ask this one question? Sure. Did you try in recalling your rebuttal witness, who's the plaintiff, were you trying at that point to give her side of the story set forth in the long letter? Exactly. And how is that dealt with by the court? My recollection is that Mr. Coleman did that examination and that she did deny everything that came in through the letters. The court did allow us to do that, but at that point, again, number one, we had no choice but to deal with it at that point. And number two, I don't believe anything we could have done would have been effective, given the fact that the letters came in. Thank you. Thank you, Your Honors. We'll hear from you on rebuttal. Mr. Craven. Thank you, Your Honor. My name is Charles Craven. I'm here for the FLE woman's place. Let me ask first, how can I help you decide this case? You can answer this, but I don't think the brief did. The plaintiff raises the fact that she was given a reason. We don't need any more fill-in employees as the basis for her termination. And then it shifted to you're sleeping on the job. And then two of the administrators, in fact, the decision-maker, I believe, as Byrne indicated, the sleeping was the sleeping, but what really did it were the two evictions and the May and June incidents. How come you didn't answer the adversary's brief, which I think was also raised below. How come we have these shifting reasons given? And how isn't this supportive of your adversary's point before us today, that getting that devastating letter in wasn't a strategically helpful thing to happen? Let me try to answer the question. The termination letter was written in very generic but very accurate terms. She said it was on advice of counsel, didn't she? Yes, Your Honor, and that was mentioned in our brief. There was testimony at trial that the letters from the residents about the incidents that occurred in May and June were the equivalent of the straw that broke the camel's back. But there was other evidence at trial that showed that the performance by the plaintiff was less than ideal. For example, when the plaintiff was reviewing her own performance evaluation, she skipped over or just danced around the 2003 performance evaluation, which summarized complaints from staff and also from residents about things such as sleeping on the job, things such as mistreating the residents. It was not a glowing report whatsoever. And you filed a grievance and then you had to drop it because it was felt that it couldn't be supported when it was challenged. Is that correct? That came later in 2004, yes. And I think what also happened in 2004 was Ms. James moved up the ladder and a protocol of written complaints came into play, correct? That was in connection with the discipline of the plaintiff. And then in May we had the long letter, and in June we had the long letter, and then we had the firing, correct? Yes, Your Honor. I'm just asking because those letters in a factual context developed in the course of the short trial become really the focal point of the decision making, do they not? I respectfully disagree, Your Honor. I think that there is other testimony that comes in here. But even if these letters, and there's other reasons given in the record, and all this is for the jury to decide whether this was made up, whether Ms. James went out and got these letters from the residents to drum up a case against the plaintiff, all that was argued and submitted to the jury. But not through the adversary process. I'm sorry, Your Honor? Not through the adversary process. At trial it was. There was no cross-examination of the proponents that all of this happened, correct? No, of course not, Your Honor. But the purpose of submitting the letters was not to prove the incidents that happened, according to the letters. Although when you read the trial transcript, you learn that the plaintiff herself did not dispute that these events occurred in May and June. She just had a different angle to it. But the letters themselves, when you read the transcript, were first raised by the plaintiff as something that was tried to be drummed up. And then when the defense came in, my partner, Mr. Santarone, came in, he wanted the witness to just summarize the letters. What's the gist of the letters? And then you see in the record that the plaintiff's attorney objects. Now, you can't overlook the fact that the plaintiff's attorney is on the record, admitted at page 338A of the appendix, that that forced to have the letters read aloud. Here's the court. See, you could have avoided all this if you just let him summarize it. But you didn't let him summarize it. Mr. Coleman, that's the plaintiff's trial attorney. That's true. The court. So he had to read the entire. Mr. Coleman, that's true. But now you're going. That's true. He's admitting that they forced these letters to be read aloud when the only thing that the defense wanted to do was to say, these letters, you received these letters. They formed a part of your reason for discharging or no longer continuing the services of the plaintiff. Yes. Could you summarize what they said? And that was just for the very relevant and crucial part of the defense case as to prove a nondiscriminatory reason. A reason. You're saying that the force of the letters, their content, would have been less if somebody gave the highlights as opposed to some of the stuff about how the writer's uncle wasn't where he was supposed to be and her kid wanted a banana and, you know, all of the. If you take out all of the stuff and you just give the highlights, would that have been better? Of course, Your Honor, because. The force of the letter. Sure, of course. Because all the witness was really being asked to do is to say, well, we had these two letters from these residents who were mistreated. They were thrown out when Ms. Kramer had no authority to throw them out and it was contrary to our policy. And that just did it. That's all that the witness was going to say. And then you get all these details because the plaintiff's attorneys wanted to force the hand. When were these letters produced and discovered? I'm not sure exactly when they were produced and discovered, Your Honor, but they were the plaintiff's attorneys took the deposition of Sarah James. And she had them in her file? Well, they mentioned them during her deposition. And that deposition was taken in April 2006. It's not included in the record. How long before trial is that? Trial is in September. Is it in the record whether the letters were sent spontaneously or whether the letters were requested by the staff at a woman's place? The letters were requested by the staff. That's fairly clear. And the reason they were requested by the staff was that the prior experience with the plaintiff, she was disciplined, she filed a grievance, there was a hearing, and the personnel committee decided that they could not sustain the discipline because there was no documentation. After that, a woman's place put into their policy that we should document these complaints. And what was the basis of keeping them anonymous? Because a woman's place wants to protect the identities of the people who stay there. But that was not challenged, was it? No, Your Honor. It was freely admitted by the plaintiff's attorneys. As a matter of fact, a woman's place protects the people that go there, so much so that it tries to keep its own location from the public view. I mean, you can understand that the people who are there were there because something really nasty is out there. If there are any more questions, I'd be happy to answer them. Thank you. Thank you. Oh, there is a procedural matter that kept me up at night, so I have to throw it on the table. I filed a motion for summary disposition that was referred by the motions panel to the merits panel. I've never been confronted by that kind of situation. I think it's still a live motion. We haven't acted on it. And I guess if we're here, having spent all this time on it, we're not going to deal with it summarily. But we haven't penned an order on it, so you don't need to worry about it. Thank you. Thank you. The same arguments would be raised there anyhow. Thank you. Mr. Eli, can I ask you a question? Didn't you make a strategic decision when you found out about these letters to just let the sleeping dogs lie, let this argument be made that it was unfair? Because guess what? You go find out who these people are, you depose them, poof, you're gone. My recollection, again, is I'm not certain that's what happened. I will be up front knowing my partner, it's very possible. He was handling the case at that point. Oh, he was handling the case. That hasn't kept you up at night. No, it hasn't. I would point out, to the extent the motion for summary disposition was argued, I request that you not grant that, just for the record. How much does the fact that this is a battered woman's shelter, the long letter itself talks about the abuser having located her, I don't know whether because she had to hang out in the hospital or whatever, how much relevance and importance does the very highly protected status of these women play a role? It's not a comfortable answer for me to give you. In the context of trial, as Your Honor pointed out, we don't have an opportunity to cross-examine a piece of paper. We should have been given their names in Rule 26 disclosures. We would have agreed to a confidentiality agreement if that's what they wanted. We do that all the time in a number of cases. You didn't push on that. We did not. Judge Hayden's point is well taken about the focal point of the decision. The way this came out and the way that this was dealt with in closing at 361A, it's clear that this was the focal point,  Mr. Santarone, 361A, line 13, said, she was involved in incidents in May and June, and those incidents are what led up to the decision not to put her on the list. The women that are in there aren't there to be punished. They're there because they're victims, and a woman's place looks at them first and looks out for them. And the complaints were just coming. The complaints were heard by the supervisors. So that's not bad enough. The next page, 362A, Mr. Santarone again, I'm not going to go over detailed testimony you heard, but Susan Hauser, you saw her reaction reading those letters. You saw how those letters affected her. These letters didn't just come out of the blue. There had been complaints leading up to those letters, and putting the women out of the shelter was the final straw. Can't win against something like that, especially when I can't cross-examine it. Well, but you can object. I did, but not on closing. I would point out I objected several times to the evidence coming. As a lawyer, I sometimes objected on closing when there was something that I really felt needed to be objected to. We made a tactical decision at that point not to do that. But again, the fact that in the context of the entire trial, if you review the record carefully, and I would urge you again to take a look at the Salins case, even though it is in the criminal context, it's still a hearsay case. This was not admitted for its truth. It was not argued for its truth. It was not admitted as an exception to hearsay. If there's no other questions, I'll conclude. Thank you, Your Honor. Thank you. Thank you, counsel. The case was well argued. Thank you for your candor. We will take the matter under advisement and ask the clerk to rescind.